HAGENS BERMAN SOBOL SHAPIRO LLP
Robert B. Carey #011186
Donald Andrew St. John #024556
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail:  rcarey@hbsslaw.com
             andy@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman, WSBA #12536
Tom Loeser, WSBA #38701
Genessa Stout, WSBA #38410
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-Mail:  steve@hbsslaw.com
             toml@hbsslaw.com
             genessa@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| GRANT A. GOMEZ and LANIE L. GOMEZ, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>WELLS FARGO BANK, N.A. and VALUATION INFORMATION TECHNOLOGY, LLC, d/b/a RELS VALUATION,<br><br>     Defendants. | No. CV-09-00181-PHX-GMS<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br>(Violations of 18 U.S.C. § 1962; 12 U.S.C. § 2607; Cal. Bus. & Prof. Code § 17200, *et seq*.; Unjust Enrichment; Breach of Fiduciary Duty)<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ................................................................................ 1

II.    JURISDICTION AND VENUE ........................................................... 3

III.   PARTIES ............................................................................................. 3

     A.    Plaintiffs ................................................................................ 3

     B.    Defendants ............................................................................. 3

IV.   FACTUAL ALLEGATIONS ............................................................... 5

     A.    Wells Fargo ........................................................................... 5

     B.    The National Appraisal Market ............................................. 6

     C.    The Inflated Appraisal Fee Scheme ...................................... 6

     D.    The Gomezes' Refinanced Mortgage Transaction was Subject to the Inflated Appraisal Fee Scheme ............................... 12

     E.    Federal Regulation Under RESPA ...................................... 14

V.    TOLLING OF THE STATUTE OF LIMITATIONS ......................... 17

     A.    Equitable Estoppel............................................................... 19

     B.    Equitable Tolling ................................................................. 20

VI.   CLASS ACTION ALLEGATIONS .................................................. 21

     A.    Class Definition ................................................................... 21

     B.    Numerosity .......................................................................... 21

     C.    Commonality ....................................................................... 21

     D.    Typicality ............................................................................ 22

     E.    Adequacy............................................................................. 22

     F.    The Prerequisites to Maintaining a Class Action for Injunctive Relief are Readily Apparent ....................................... 22

     G.    Common Questions Predominate, and the Class Action Device is Superior ........................................................................... 23

010098-12  298699 V1

VII.     CLAIMS FOR RELIEF ............................................................................ 23

COUNT I:  Violation of 18 U.S.C. § 1962(c)(d) .............................................. 23

      A.     The Enterprises ...................................................................... 24

            1.     The Wells Fargo Appraisal Enterprise ............................. 24

            2.     Alternative Enterprise Allegations:  The Wells Fargo Enterprise ... 25

      B.     The Defendants' Use of the U.S. Mails and Interstate Wire Facilities ....... 26

      C.     Conduct of the RICO Enterprises' Affairs ................................ 28

      D.     The Defendants' Pattern of Racketeering Activity ..................... 29

      E.     Damages Caused by the Defendants' Scheme ............................ 29

COUNT II:  VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES
      ACT AGAINST DEFENDANT RELS VALUATION 12 U.S.C. § 2607(b) ....... 30

COUNT III:  VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES
      ACT 12 U.S.C. §§ 2607(a), (c) ..................................................... 31

COUNT IV:  UNJUST ENRICHMENT AGAINST DEFENDANT RELS
      VALUATION ............................................................................... 32

COUNT V:  VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
      AGAINST WELLS FARGO (Cal. Bus. & Prof. Code § 17200, *et seq.*) ............. 33

COUNT VI:  PATTERN OF UNLAWFUL ACTIVITY IN  VIOLATION OF
      A.R.S. § 13-2314.04 ................................................................... 36

VIII.    PRAYER FOR RELIEF ...................................................................... 40

IX.     JURY TRIAL DEMANDED ................................................................ 40

010098-12  298699 V1

Plaintiffs, Grant A. Gomez and Lanie L. Gomez, by their attorneys, on behalf of themselves and all others similarly situated, demand a trial by jury, and complain as follows:

## I.   INTRODUCTION

1.   This action arises from a scheme ("The Inflated Appraisal Fee Scheme" or "Scheme") between Wells Fargo Bank N.A. ("Wells Fargo") and Rels Valuation to profit from imposing marked-up appraisal fees on Wells Fargo borrowers and controlling the appraisal process and results.  The Scheme works as follows:

a.   Wells Fargo is one of the largest lenders in the United States for home loans.  On many of the loans it underwrites, Wells Fargo requires the borrower to have the property appraised by its affiliate, Rels Valuation.

b.   Wells Fargo benefits from requiring borrowers to use Rels Valuation both through the profits rolled up to Wells Fargo's and Rels Valuation's common parent, and because Wells Fargo gains control of the appraisal process and is thus able to influence the appraised values assigned to properties on which it is lending.

c.   Rels Valuation hires an outside appraiser to perform the actual appraisal.

d.   Relying on the market power derived from its parent Wells Fargo, Rels Valuation demands and appraisers agree to undertake appraisals and to charge Rels Valuation an amount for appraisal services far under the prevailing market rate for appraisals.

e.   At the closing, the HUD-1 settlement statement presented to the borrower lists as a charge an appraisal fee paid to Rels Valuation that is vastly in excess of the charge incurred by Rels Valuation, in some cases twice as much.  There is no disclosure to the borrower of the fact that the actual cost of the appraisal is far less than presented on the closing statement and that the bulk of the fee is simply a markup by Rels Valuation – a fee for no services rendered.

010098-12 298699 V1

f.      Independent appraisers hired by Rels Valuation are instructed by Rels Valuation to not include any documents, such as an invoice, that reflects the true fee and are told to remain silent about the true fee or they will be barred from further work on Wells Fargo loans.

2.      Due to Wells Fargo's market power and the high volume of loans it underwrites, tens of thousands if not hundreds of thousands of borrowers have been victims of this Scheme.  If one assumes 100,000 occurrences per year with an inflated fee of $200 per occurrence, this netted Wells Fargo/Rels Valuation an additional $20 million per year.  Over time, this netted Defendants perhaps as much as over a hundred million dollars in phony and unearned fees.

3.      The Scheme works because of:  (1) Wells Fargo's insistence that Rels Valuation be the appraisal firm that conducts the appraisal on the borrower's loan; and (2) the secret agreement between Wells Fargo and Rels Valuation to mark up the actual cost of the appraisal and to have the actual appraisal done by a third party at a fraction of the cost listed on HUD-1.  If Wells Fargo did not insist on Rels Valuation's exclusivity, an independent appraiser would charge Wells Fargo the actual cost of the appraisal and Wells Fargo, through its affiliate Rels Valuation, would be unable to skim off hundreds of dollars for no work.

4.      Plaintiffs and putative Class members are harmed from the Scheme: (1) because they end up paying both the actual cost of their appraisal – the fee the appraiser charged to Rels Valuation – plus the markup for no services rendered tacked on by Rels Valuation; and (2) because Wells Fargo, through Rels Valuation, often influences the result of the appraisals so that Plaintiffs and Class members do not get the benefit they pay for – an appraisal that accurately reflects the value of the property.  Wells Fargo and Rels Valuation benefit from the Scheme through the increase in appraisal business steered to Rels Valuation and the ill-gotten gains rolled up to both companies' parent corporation, Wells Fargo & Co.  Through the Inflated Appraisal Scheme, Wells Fargo

010098-12  298699 V1

and Rels Valuation violate the federal Racketeering Influenced and Corrupt Practice Act, the Real Estate Settlement Procedures Act ("RESPA") and state law.

## II.   JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which confers federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any Defendants" and the aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C. §§ 1332(d)(2) and (6).  This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court and Defendants systematically and continually conduct business throughout the State of Arizona.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

7.     Much of Defendants' activities and operations have been performed in this District, and Defendants maintain many offices in this District.  Wells Fargo has over 25 offices in the State of Arizona and conducts operations out of the Wells Fargo Plaza at 100 West Washington Street.  Rels Valuation hires dozens of appraisers in the State of Arizona.

## III.   PARTIES

**A.     Plaintiffs**

8.     Plaintiffs Grant A. Gomez and Lanie L. Gomez (the "Gomezes") are a married couple residing within the State of Arizona.  During the Class Period, the Gomezes refinanced their home located in Scottsdale, Arizona with a mortgage from Wells Fargo.

**B.     Defendants**

9.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association chartered in Sioux Falls, South Dakota.  It is headquartered in San Francisco,

010098-12 298699 V1

California.  Wells Fargo provides residential mortgages through its division Wells Fargo Home Mortgage.

10.     Wells Fargo is a diversified financial services company, ranking as the seventh-largest bank holding company in the United States as of 2000.  The company's community banking operations serve nearly 11 million customers through more than 3,000 bank branches (or what the company calls "stores") in 23 states, most of which are in the western United States – Ohio being the easternmost state of operation.  Wells Fargo is the nation's number one home mortgage lender, with more than 1,200 "stores" serving all 50 states.  The company is one of the top "cross-sellers" of financial services in the country, offering credit cards, personal loans, wealth management services, and insurance (the firm is the nation's second-largest crop insurer).  Business-oriented services include commercial banking services, lending, investment banking, venture capital, and equipment leasing.  Wells Fargo is one of the leaders in the realm of online banking, having become the first major financial services firm to offer Internet banking back in 1995.

11.     Defendant Valuation Information Technology, LLC, d/b/a Rels Valuation, ("Rels Valuation") is an Iowa limited liability company headquartered in Minnetonka, Minnesota.  Valuation Information Technology, LLC is a joint venture between First American Real Estate Solutions, a subsidiary of First American Corporation, and Wells Fargo Foothill, a subsidiary of Wells Fargo & Co., the parent of Wells Fargo Bank.  Valuation Information Technology, LLC is a provider of real property appraisals.

12.     RELS LLC is a joint holding company formed by First American and Norwest Mortgage, Inc. in November 1998.  Prior to the joint venture, Norwest operated two companies:  Value IT, which marketed appraisal services, and VIE, which provided income and employment verification reports to lenders.[1]

---

[1] *Trendlines*, January 1, 1999.

010098-12  298699 V1

13.     RELS LLC does business through its wholly-owned subsidiaries, Valuation Information Technologies LLC, d/b/a RELS Valuation, and RELS Reporting Services LLC.  The first entity is a provider of real property appraisals and the second provides borrower credit reporting, employment and income information to mortgage lenders.[2]

14.     RELS LLC is owned 50.1% by First American Real Estate Solutions and 49.9% by Foothill Capital Corporation.[3]

15.     First American Real Estate Solutions is a subsidiary of First American Corp.[4] and Foothill Capital Corporation, a/k/a Wells Fargo Foothill, is a subsidiary of Wells Fargo & Co.[5]

16.     Foothill Capital was acquired by Norwest in 1995 and Norwest merged with Wells Fargo in 1998.[6]

## IV.     FACTUAL ALLEGATIONS

**A.     Wells Fargo**

17.     Wells Fargo had hundreds of billions of dollars in loan production each year and a residential mortgage servicing portfolio in excess of $1 trillion.  Its mortgage lending segment has operated in a variety of sectors, including retail, wholesale, and correspondent lending.

18.     Wells Fargo has sourced loans through a network of over 30,000 contracted mortgage brokers.

19.     Wells Fargo's wholesale lending channel has underwritten and funded mortgage loans sourced by mortgage loan brokers and other financial intermediaries.

---

[2] First American Corp., Form 424B3, January 28, 1999.

[3] Certification as to Interested Parties, filed by RELS in *Jackson, et al. v. Wells Fargo Home Mortgage, et al.*, No. C08-1781 (N.D. Ala.), October 8, 2008.

[4] First American Corp. 2008 Form 10-K.

[5] Wells Fargo press release, June 4, 2003.

[6] *Id.* and Wells Fargo press release, April 17, 2000.

010098-12 298699 V1

**B.      The National Appraisal Market**

20.      With the real estate boom of 2000-2006, the number of transactions in real estate (purchases and refinances) increased significantly.  To service the drastic increase in transactions, the number of real estate-related service providers also grew tremendously.  For example, the number of realtors in the United States grew from 750,000 in 2000 to over 1.3 million in 2006.[7]  Likewise, Wells Fargo's fleet of corporate and affiliated mortgage brokers grew as did the number of property appraisers.

21.      With the growing number of appraisers and increased competition in the appraisal marketplace, the environment was ripe for a market force such as Wells Fargo to exert its will on appraisers, forcing "independent" appraisers to lower the amounts they charged on Wells Fargo loans; all the while Wells Fargo maintained market rates to its borrowers and kept the excess, all for no additional services rendered.

22.      Wells Fargo required Plaintiffs and Class members to use Rels Valuation, both to reap the significant profits derived from the appraisals on Wells Fargo loans and to control the appraisal process and guarantee that Wells Fargo could close whatever loans it wanted to, irrespective of the actual market values of the properties on which it was lending.

**C.      The Inflated Appraisal Fee Scheme**

23.      Because of the importance of appraisals in the home-lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. § 34.44, require appraisers to conduct their appraisals independently:  "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  USPAP Ethics Rule (Conduct).  USPAP rules also provide that "[a]n appraiser must not accept an

---

[7] http://bubblemeter.blogspot.com/2008/04/realtors-leaving-nar-at-fast-clip.html.

010098-12  298699 V1

assignment that includes the reporting of predetermined opinions and conclusions." In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.

24.    USPAP is incorporated into federal law by 12 C.F.R. § 34.44, and federal law sets independence standards for appraisers involved in federally-regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.*  The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45.  For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

25.    Wells Fargo and Rels Valuation are aware of the importance of accurate appraisals and the requirements imposed by USPAP.

26.    As described below, Wells Fargo and Rels Valuation set out to use their combined market power to illegally squeeze additional monies out of home buyers, and have implemented the Inflated Appraisal Fee Scheme as described below.

27.    Pursuant to the Scheme, Wells Fargo sends to prospective borrowers a Good Faith Estimate detailing an offered loan.  In the Good Faith Estimate, Wells Fargo tells the borrower that it requires "an appraisal from an appraiser we select from our approved list."  Wells Fargo then designates the specified appraiser as Rels Valuation. Although Rels Valuation performs the appraisal, there is no contractual relationship between Rels Valuation and the borrower.

28.    For most real estate settlement service providers, RESPA forbids one company from requiring the use of another company as this would inherently invite

pricing abuse by the required provider to the benefit of itself and the requiring provider – all at the expense of the home buyer. However, RESPA has an exception for lenders, such as Wells Fargo, to permit them to require a specific appraiser, ostensibly because the purpose of the appraisal is supposed to be to protect the lender and thus the lender should be incentivized to get a fair and accurate appraisal. For Wells Fargo, however, the required use exception in RESPA became merely a loophole in the regulation through which it could squeeze extra profits from unknowing and unsuspecting home buyers.

29. As part of the Scheme, Rels Valuation then contacts independent appraisers to perform the appraisal and insists that the appraisals be performed at a very low rate.

30. Independent appraisers have informed Wells Fargo and Rels Valuation that the rate demanded is so low that a proper appraisal cannot be performed. Wells Fargo knows this but nonetheless Wells Fargo insists on a vastly reduced rate, sacrificing quality for price.

31. Due to its economic clout, and as part of the Scheme, Rels Valuation informs appraisers that if they wish to perform appraisals for Wells Fargo loans, they must agree to a reduced fee that is far below the market rates that the appraiser had been charging. If the appraiser does not agree, he or she is removed from the approved appraiser list and/or placed on an Exclusionary List. In addition, appraisers who have already been placed on an Exclusionary List are told that they can only be removed from the Exclusionary List if they agree to become a Rels Valuation-approved appraiser, which in turn requires them to perform appraisals for Rels Valuation and Wells Fargo at much lower than market rates.

32. When the loan is closed, however, Rels Valuation does not pass on the reduced appraisal fees to the home buyer. Instead, it inflates the appraisal fee and represents to borrowers that the appraisal cost is far in excess of the actual cost of the appraisal. There is no disclosure of this markup to the borrower and Rels Valuation performs no additional appraisal services beyond merely forwarding the appraisal to Wells Fargo or the escrow provider for the transaction.

010098-12  298699 V1

33.     The impact of the Scheme on consumers was described in a complaint filed by the National Association of Mortgage Brokers, Inc. in a challenge to the implementation of a Home Valuation Code of Conduct that would impact the appraisal process in loans involving Fannie Mae and Freddie Mac.  In describing the impact of the Home Valuation Code of Conduct, which mandates the use of companies like Rels Valuation, the brokers confirm that the practice at issue in this case does in fact occur. Thus paragraph 46 alleges:

> Consumers who work with a direct lender affiliated with an AMC may be paying inflated prices.  The home value appraisals completed by AMCs typically are actually performed by independently contracted third-party appraisers. *The AMCs contract with an appraiser to prepare an appraisal at below-market rates and then mark up the cost of the appraisal before the appraisal is provided to the lender.* Because consumers typically reimburse lenders for the cost of an appraisal, *the increase in cost is borne by the consumer* who does not receive any benefit from the initial savings on the appraisal fee.  (Emphasis added.)

34.     In this case, Rels Valuation is the equivalent of "AMC" referred to above, who is contracting with third-party appraisers and marking up the appraisal to the detriment of the consumer.

35.     While the exception to RESPA's required use prohibition allows Wells Fargo to require the use of Rels Valuation, under other RESPA provisions, due to the relationship between Wells Fargo and Rels Valuation, Wells Fargo is required to provide an "Affiliated Business Arrangement" ("ABA") disclosure to its customers.  The ABA disclosure must note "the existence of such an arrangement to the person being referred and, in connection with such referral, [the customer must be] provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred … at or before the time of the referral.…"  12 U.S.C. § 2607.

36.     While some Wells Fargo customers are told of the affiliated relationship between Wells Fargo and Rels Valuation, none know – or have any reason to suspect –

- 9 -

that the appraisal fee set forth on the HUD-1 Settlement Statement is actually far in excess of the actual charge the appraiser made for his appraisal.

37.     As a *quid pro quo* exchange for the referral from Wells Fargo to Rels Valuation, Rels Valuation gives Wells Fargo visibility into the appraisal process and substantial control over the outcome of the appraisal.  This benefit is a "thing of value" as defined in RESPA and is utilized by Wells Fargo to control and maximize its ability to control the mortgage-lending process.  Even when Wells Fargo makes the RESPA-required ABA Disclosures, it nonetheless violates RESPA's prohibition on referral fees because it gets a thing of value – *i.e.*, control of the appraisal process and outcome – beyond merely the return on its parent's ownership interest in Rels Valuation.

38.     The Scheme continues to operate and negatively influence fair appraisals in the real estate market.  It has been described by one appraiser as corrupting the integrity of the process and confirms the appraisal fee scheme at issue as follows:

> Fellow Appraiser:
>
> It may have come to you attention that RELS has began a "phased" appraisal process that begins with a $45 desktop appraisal report.
>
> Appraisers on the RELS list are given the "opportunity" to participate in a program intended to save their customers time and money.  Appraisers are asked to perform desktop appraisals to be used to evaluate a borrower's equity position.
>
> * * *
>
> This program is dangerous on several levels:
>
> 1.   It is comparable to the "comp checks' our industry has fought so hard to eliminate.
>
> 2.   It amounts to coercion and other possible ethical issues including determining <u>a predetermined value based upon the outcome of the appraisal.  The appraiser is told that if they participate in this program they will have a greater chance of being offered the assignment upon upgrade of the report</u> (emphasis added).

010098-12 298699 V1

3. Appraisers are enticed into providing discount fee products with the carrot of additional new work and higher appraisal order volumes.

4. The desktop appraisal opens appraisers to increased liability since their analysis and reporting are fully accountable with USPAP and any additional state code.

5. If RELS is so "concerned with what borrowers or clients are paying" for appraisal services and reports, <u>they could reduce their current override of up to 75% over contract appraiser fees</u> (The appraiser is paid a fee of $200 and RELS charges the borrower $350).  (Emphasis added.)

* * *

9. Discounted appraisal fees and rushed reporting, especially in this complex and dynamic market, is inadequate to allow the appraiser the ability to provide an accurate and reliable appraisal report and analysis. This type of allowed activity in the past has lead to our financial markets troubles.  The appraiser must be provided adequate compensation and time to provide much needed accuracy and reporting.  RELS $45, $185, $200 and other low demand fees destroy creditability in appraisals and appraisal analysis.  The "client", "bank" or "borrower" can not continue to be allowed to control fees in the analysis, reporting times and adequacy of reporting based upon the Scope of the Appraisal Assignment, the Intended Use of the Appraisal or the Intended User of the Appraisal.

As appraisers it is time to make a stand against this type of bullying by appraisal management companies and banks.  It is our responsibility to protect public trust with the highest level of professional expertise.  The Real Estate Appraisal profession was founded on the need for accurate asset valuation and is a result of the Great Depression in the 1930's.  Our profession was created by the Federal Government to protect the "Public Trust" in real property value.  This power and responsibility was not given to Settlement Service Companies, Title Companies or Banks, it was given to us, the real estate appraiser.  It might be interesting to note that the Great Depression did not begin because of the Stock Market Crash of 1929, but by the Real Estate Speculation Crash in Florida of 1916-1928.

010098-12  298699 V1

39.     The foregoing confirms the undisclosed markup and the coercion used by Rels Valuation to get appraisers to agree to the Scheme.  It also indicates the danger to accurate appraisals the Scheme creates.

**D.     The Gomezes' Refinanced Mortgage Transaction was Subject to the Inflated Appraisal Fee Scheme**

40.     On March 1, 2007, the Gomezes refinanced property located at 13036 E. 50th Street, in Scottsdale, Arizona through Wells Fargo.

41.     The Gomezes' transaction was a loan for $288,000.  This loan was a "federally related mortgage loan" as defined in RESPA.

42.     An initial packet of loan disclosure documents was sent via mail by Wells Fargo to the Gomezes on or about February 22, 2007.

43.     As part of the Scheme, Wells Fargo required the Gomezes to have their home appraised through Rels Valuation.  The Gomezes did not have a contractual relationship with Rels Valuation.

44.     In the HUD-1 Good Faith Estimate dated February 22, 2007, Wells Fargo disclosed that it had a business relationship with Rels Valuation and claimed that the estimated charges for Rels appraisal work was $50- $650.  This statement was false in that Defendants knew the exact amount Rels would charge and that the actual cost of the appraisal would be under $300, and that the appraisal would be performed not by Rels Valuation but by a third party.

45.     In the same document, Wells Fargo disclosed that it requires use of either Lenders Service, Inc. or Rels Valuation for the appraisal.  In the Gomezes' case, it was Rels Valuation.

46.     The actual closing statement signed by the Gomezes on March 5, 2007, indicates to the Gomezes that an appraisal fee of $495 was paid to Rels Valuation.  This statement was false and misleading as Rels Valuation did not perform an appraisal and the actual cost of the appraisal was far less.

010098-12 298699 V1

47.     On or about March 1, 2006, the Gomezes purchased property at 13036 North 50th Street, Scottsdale, Arizona, with Wells Fargo as the lender.  In the HUD-1 statement, they were informed that an appraisal fee would be incurred in the amount of $375, to be paid to Rels Valuation.

48.     The final settlement statement of March 2, 2006, lists an appraisal fee of $375 to Rels Valuation.  Again, this statement is false as Rels Valuation did not undertake an appraisal.

49.     In fact, Rels Valuation does not appraise properties and did not appraise the Gomezes' property.  Instead, Rels Valuation hired an appraiser on its approved list.  Rels Valuation required the appraiser to charge $200 or less and Rels Valuation skimmed the difference between the amount disclosed at closing, $495, and the amount incurred by Rels Valuation of $200 or less.

50.     On information and belief, Rels Valuation has implemented a nationwide scheme whereby Rels Valuation will only hire appraisers who will accept less than the amount listed on a borrower's closing statement for an appraisal, and then Rels Valuation bills Wells Fargo for an amount that exceeds the actual cost of the appraisal.

51.     On information and belief, Rels Valuation paid an independent appraiser a fraction of the appraisal fee it collected from the Gomezes and kept the marked-up portion of the fee.

52.     On information and belief, Rels Valuation Appraisal performed no work and provided no appraisal services toward completion of the Gomezes' appraisal.

53.     On information and belief, Wells Fargo was able to dictate and control the outcome of the Gomezes' appraisal through its affiliated relationship with Rels Valuation.

54.     Each of the foregoing communications was fraudulent for failure to disclose the true costs of the appraisal, the skimming fees collected by Rels Valuation, and the Scheme itself and the use of a third party to conduct the appraisal.

55.     The existence of the Scheme is outlined by a Confidential Witness ("CW 1") who, in response to news of this case, wrote as follows:

> I am a certified appraiser in _____.  I recently read the article on Market Watch concerning the investigation of Wells Fargo/Rels Valuation.  I currently do work and have done many many appraisals for Wells Fargo/Rels.  I am concerned about what is presently going on with this investigation and am writing for your opinion.  I presently have reports to be written on my desk and pending orders to be inspected and I am hesitant to proceed with the incomplete work.  As of date they now owe me over $3,000+ in unpaid invoice dated back to December 2008.  As an appraiser who has been doing work for Wells Fargo for a while I can tell you that my pay for a 1004/Full Appraisal, with an understanding that they would send volume, is $250.00.  <u>I know that the borrower pays more as I've spoken to homowners [sic] who have stated that they have paid full fees between $395.00-$550.00 depending on area</u>.  (Emphasis added.)

**E.     Federal Regulation Under RESPA**

56.     The Real Estate Settlement Procedures Act of 1974 ("RESPA") was enacted to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices" in mortgage lending.  *See* 12 U.S.C. § 2601(a).

57.     Section eight of RESPA prohibits kickbacks and unearned fees.  It provides in relevant part to this Complaint as follows:

> (a) Business Referrals.  No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

> (b) Splitting charges. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

> (c) Fees, salaries, compensation, or other payments. Nothing in this section shall be construed as prohibiting …, (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed….(4) affiliated business

- 14 -

arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred…at or before the time of the referral…; (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship…

(d) Penalties for violations…

…

(2) Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

….

(5) In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys' fees.

12 U.S.C. § 2607.

58.     RESPA confers on the Secretary of the Department of Housing and Urban Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's purposes.  *See* 12 U.S.C. § 2617(a).  The relevant regulation adopted by HUD is known as Regulation X and sets forth in relevant part:

§ 3500.14 Prohibition against kickbacks and unearned fees.

(a) Section 8 violation.  Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement as such under § 3500.19.

(b) No referral fees.  No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person.  Any referral of a settlement service is not a compensable service, except as set forth in § 3500.15(g)(1).

- 15 -

010098-12 298699 V1

> A business entity (whether or not in an affiliate relationship)
> may not pay any other business entity or the employees of
> any other business entity for the referral of settlement service
> business.
>
>     (c) No split of charges except for actual services
> performed.  No person shall give and no person shall accept
> any portion, split, or percentage of any charge made or
> received for the rendering of a settlement service in
> connection with a transaction involving a federally related
> mortgage loan other than for services actually performed.  A
> charge by a person for which no or nominal services are
> performed or for which duplicative fees are charged is an
> unearned fee and violates this section.  The source of the
> payment does not determine whether or not a service is
> compensable.  Nor may the prohibitions of this Part be
> avoided by creating an arrangement wherein the purchaser of
> services splits the fee.
>
> …

24 C.F.R. § 3500.14.

59.     RESPA requires that a settlement service provider disclose any affiliated business arrangement with any other service provider to whom business is referred. RESPA defines "affiliated business arrangement" as:

> An arrangement in which (A) a person who is in a position to
> refer business incident to or a part of a real estate settlement
> service involving a federally related mortgage loan, or an
> associate of such person, has either an affiliate relationship
> with or a direct or beneficial ownership interest of more than
> 1 percent in a provider of settlement services; and (B) either
> of such persons directly or indirectly refers such business to
> that provider or affirmatively influences the selection of that
> provider.

24 C.F.R. § 3500.15(b)(1); 12 U.S.C. § 2602(7).

60.     Defendants Wells Fargo and Rels Valuation have an affiliated business arrangement as such term is defined in RESPA.

61.     The appraisal services provided by independent appraisers and the appraisal fees charged by Rels Valuation and Wells Fargo are settlement services and fees subject to RESPA regulation.

010098-12 298699 V1

62.     Under RESPA, Wells Fargo can only refer settlement service to Rels Valuation if "disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred … at or before the time of the referral .…"

63.     Even where an affiliated business arrangement is disclosed, RESPA only permits a referral when the only thing of value received for the referral is the referrer's normal return on their investment in the affiliated company.  Thus, even when disclosed, Wells Fargo and Rels Valuation violate RESPA when Wells Fargo refers appraisal business to Rels Valuation because Rels Valuation gives Wells Fargo visibility into and control of the appraisal process, which is a thing of value under RESPA.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

64.     Plaintiffs' RESPA claims are subject to both equitable estoppel, stemming from Defendants knowingly and fraudulently concealing the facts alleged herein, and equitable tolling, stemming from Plaintiffs' inability to obtain vital information underlying their claims.  Defendants are estopped from relying upon a statute of limitations defense because they purposefully concealed the true cost of the appraisals used in Plaintiffs' transaction and, therefore, concealed that these true costs were marked up by Rels Valuation for no additional services rendered.  In addition, Defendants concealed their affiliation and concealed – on an ongoing basis distinct from the Scheme – that they were using their market power to force appraisers to charge Defendants less than Defendants were, in turn, charging to Plaintiffs for no additional services rendered. Separate and apart from Defendants' acts of concealment, any applicable statutes of limitation are properly tolled because Plaintiffs did not know and could not have learned the true facts underlying their claims until shortly before filing their Complaint.

65.     Rels Valuation actually takes steps to affirmatively conceal the Scheme. On its website that is used by mortgage brokers, Rels Valuation lists fees for appraisal of typical properties for each state, ranging from $300 to $420.  A consumer who wanted to

find information about the Rels appraisal fee in his or her area could with some extraordinary effort obtain this information.  However, this information is false as the actual fee is far less.

66.    The Rels Valuation published and false fee schedule states:

### For Typical Properties up to $500k in value
### Full Interior

| State | 1004/1073 |
|-------|-----------|
| AK | Quote |
| AL | $350 |
| AR | $360 |
| AZ | $350 |
| CA | $340 |
| CO | $360 |
| CT | $315 |
| DC | $340 |
| DE | $330 |
| FL | $325 |
| GA | $330 |
| HI | Quote |
| IA | $340 |
| ID | $425 |
| IL | $325 |
| IN | $325 |
| KS | $360 |
| KY | $300 |
| LA | $340 |
| MA | $340 |
| MD | $325 |
| ME | $330 |
| MI | $310 |
| MN | $325 |
| MO | $325 |
| MS | $340 |
| MT | $440 |

- 18 -

| State | 1004/1073 |
|:---:|:---:|
| NC | $330 |
| ND | $425 |
| NE | $400 |
| NH | $345 |
| NJ | $325 |
| NM | $400 |
| NV | $350 |
| NY | $325 |
| OH | $315 |
| OK | $360 |
| OR | $415 |
| PA | $325 |
| RI | $315 |
| SC | $340 |
| SD | $420 |
| TN | $340 |
| TX | $360 |
| UT | $360 |
| VA | $340 |
| VT | $360 |
| WA | $425 |
| WI | $315 |
| WV | $300 |
| WY | $410 |

67.     In fact, the truth is that in each state Rels Valuation often pays a portion of

the published fee to an appraiser but charges the borrower the fee listed above or more.

Thus, if a consumer were to get on the Rels Valuation website available to mortgage

brokers the posted fee schedule conceals the scheme.

**A.     Equitable Estoppel**

68.     Defendants are estopped by their own fraudulent concealment from

asserting the statute of limitations as an affirmative defense against Plaintiffs' claims.

010098-12  298699 V1

69.     Rels Valuation created the perception that it was charging appraisal fees for actual services rendered.  Rels Valuation concealed from Plaintiffs and the Class the true third-party costs of the appraisal fees that it charged.  Rels Valuation concealed that it was marking up the appraisal fee charges and charging fees for no appraisal services rendered.

70.     Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein, including their affiliated nature and their receipt of unearned settlement service fees for no services rendered.  These practices were in derogation of RESPA and Defendants' fiduciary and agency duties.

71.     The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where Plaintiffs filed suit promptly upon discovering the facts essential to their claims, described herein, which Defendants knowingly concealed.

**B.     Equitable Tolling**

72.     Plaintiffs and members of the Class were or have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part.  As further set forth below, Plaintiffs were not on inquiry notice of Defendants' wrongdoing and had no duty to initiate an investigation of any nature because the charges on their HUD-1 Settlement Statements appeared to be legitimate.  Plaintiffs did not have any reason to know of the RESPA violations or injuries described herein and did not and could not have known of Defendants' violations of fiduciary and agency duties or unjust enrichment.

73.     Plaintiffs were relieved of any duty to investigate because they reasonably and justifiably relied on Wells Fargo to fulfill its duties.  Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiffs had attempted to investigate, such investigation would have been futile because it would not have uncovered the true, unlawful nature of Defendants' profiteering schemes alleged herein.

010098-12 298699 V1

Indeed, as alleged above, *e.g.*, ¶¶ 1(f), 66, Rels Valuation takes action to conceal the true costs of the appraisal.

74.     Plaintiffs and members of the Class did not discover and could not have discovered, despite all due diligence, that:  (1) Wells Fargo and Rels Valuation were exerting their market power to force appraisers to charge to Rels Valuation fees substantially under market rates; (2) Rels Valuation was marking up these independent appraisal fees while performing no work toward completion of the appraisals.  Plaintiffs' claims were thus equitably tolled until they discovered the true facts underlying their claims shortly before the filing of the Complaint.

## VI.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

75.     Plaintiffs bring this action on behalf of themselves and on behalf of the following proposed Class:

> All persons or entities involved in a real estate transaction who paid an appraisal fee for the appraisal of their property where Wells Fargo was the lender and Rels Valuation was the required appraiser and the appraisal was conducted by a third party.

### B.     Numerosity

76.     The Class is so numerous that joinder of all members is impracticable. Class members number in the hundreds of thousands.  The precise number of Class members and their addresses are unknown to the Plaintiffs, but can be obtained from Defendants' records.

### C.     Commonality

77.     There are questions of law or fact common to the Class, including at least the following:

(a)     Whether Defendants created and implemented the Scheme at issue;

(b)     Whether Defendants used the wires and mails to further the Scheme;

(c)     Whether Defendants violated RICO, RESPA and state law;

(d)     Whether the statute of limitation for Plaintiffs' RESPA claims should be properly tolled;

(e)     Whether Defendants should be estopped from relying on the statute of limitation for Plaintiffs' RESPA claims;

(f)     Whether Defendants' wrongful conduct resulted in economic damage to Plaintiffs and members of the Class, and the amount of said damages; and

(g)     What relief should be imposed in favor of the Plaintiffs and the Class.

**D.     Typicality**

78.     Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all members of the Class.  Plaintiffs do not have interests antagonistic to or in conflict with those of the other members of the Class.

**E.     Adequacy**

79.     Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class actions.  Plaintiffs will fairly and adequately represent the interests of the Class members.

**F.     The Prerequisites to Maintaining a Class Action for Injunctive Relief are Readily Apparent**

80.     The prerequisites to maintaining a class action for injunctive relief exist:

a.     If injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and the members of the Class will continue; and

b.     Plaintiffs and the members of the Class have no adequate remedy at law for the injuries which are threatened to recur, in that, absent action from this Court, Defendants will continue to violate RICO, RESPA and state law, and cause damage.

010098-12 298699 V1

81.     The prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Defendants – for example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal.  Individual actions may, as a practical matter, be dispositive of the interests of the Class.

82.     Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

**G.     Common Questions Predominate, and the Class Action Device is Superior**

83.     The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class.  Plaintiffs' counsel, highly experienced in class actions, foresee little difficulty in the management of this case as a class action.

**VII.   CLAIMS FOR RELIEF**

**COUNT I**

**Violation of 18 U.S.C. § 1962(c)(d)**

84.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

85.     This cause of action, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendants on behalf of the Class.

86.     Plaintiffs, each Class member, and each Defendant is a "person," as that term is defined in 18 U.S.C. § 1961(3).

010098-12 298699 V1

87.     At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 1962(d).

**A.      The Enterprises**

      **1.       The Wells Fargo Appraisal Enterprise**

88.     The RICO "enterprise" is an association-in-fact entitled the "Wells Fargo Appraisal Enterprise" consisting of:  (1) Wells Fargo, including its Rels Valuation loan closing services subsidiaries, (2) other mortgage brokers not named as defendants herein who have contracts with Wells Fargo pursuant to which they sell, arrange, promote, or otherwise assist Wells Fargo in directing borrowers into loans issued by Wells Fargo, and (3) appraisers who are hired by Rels Valuation to conduct appraisals.  The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of closing loans on properties and providing appraisals on real estate transactions in which Wells Fargo is the mortgage lender.

89.     The Wells Fargo Appraisal Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

90.     While all Defendants participate in and are members and part of the Wells Fargo Appraisal Enterprise, they also have an existence separate and distinct from the enterprise.

91.     In order to inflate appraisal fees, Defendants need a system that allows them to do so.  The Wells Fargo Appraisal Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their Scheme.  Furthermore, the participation by the Rels Valuation affiliates in the Wells Fargo Appraisal Enterprise allows the enterprise to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities.  Rels

- 24 -

Valuation's participation in the enterprise allows the normal checks and balances within the mortgage process to be eliminated, permitting Defendants to advance their Scheme and conceal the fraudulent activity they have been engaging in.

92.    The Defendants control and operate the Wells Fargo Appraisal Enterprise as follows:  (a) Wells Fargo tells a borrower through the Good Faith Estimate that Rels Valuation must perform the appraisal; (b) Rels Valuation then hires a third party appraiser to do the actual work; (c) Rels Valuation tells the appraiser that if he or she wishes to do business with Rels Valuation they must perform the appraisal at a rate that is set by Rels Valuation; (d) Rels Valuation then marks up that reduced rate and keeps the excess as its profits; (e) Rels Valuation directs appraisers to not disclose to borrowers the true cost of the appraisal; and (f) Wells Fargo receives a thing of value in exchange for referring its appraisal business by controlling the loan appraisal process and values, and through the common ownership of Wells Fargo and Rels Valuation by Wells Fargo & Co.

93.    The Wells Fargo Appraisal Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

**2.    Alternative Enterprise Allegations:  The Wells Fargo Enterprise**

94.    Plaintiffs, the Class members and Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

95.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Wells Fargo Enterprise":  (1) Wells Fargo and (2) Wells Fargo's affiliates, including its Rels Valuation division.

96.    The Wells Fargo Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

97.    While all Defendants participate in and are members and part of the Wells Fargo Enterprise, they also have an existence separate and distinct from the enterprise.

010098-12 298699 V1

98.   The Wells Fargo Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

99.   The Enterprises have a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Wells Fargo, Rels Valuation and appraisers.  There is a common communication network by which Wells Fargo and brokers and appraisers shared and continued to share information on a regular basis throughout the Class Period.  Typically this communication occurred by use of the wires and mails in which Wells Fargo, Rels Valuation, brokers and appraisers exchanged information about properties and appraisers.  Wells Fargo, Rels Valuation and the brokers functioned as a continuing unit for the purposes of the Scheme.

100.   The foregoing evidences that all Defendants are willing participants in the Enterprises; had a common purpose and interest in the establishment and operations of the foregoing Scheme; and agreed to a structure wherein Rels Valuation, the brokers, and Wells Fargo would implement the Scheme.

**B.    The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

101.   The Enterprises engaged in and affected interstate commerce because they engaged in the following activities across state boundaries:  the exclusion of appraisers unwilling to participate in the Scheme; the origination of mortgages by brokers in one state for borrowers in other states; and the transmission and receipt of documents and information between Wells Fargo and Rels Valuation offices, and between loan brokers and borrowers in diverse states.

102.   During the Class Period, Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products and funds by the U.S. mails and interstate wire facilities.

103.   For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in

post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things to be delivered by commercial interstate carriers, including but not limited to promotional materials, applications, agreements, manuals, and correspondence.

104.   For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to promotional materials, applications, agreements, manuals, and correspondence, and made or caused to be made false statements over the telephone, electronic mail, and internet.

105.   The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, *inter alia*, promotional materials, applications, agreements, manuals, correspondence, progress reports, loan application disclosures.

106.   Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

107.   The nature and pervasiveness of the Scheme, which was orchestrated out of Wells Fargo's and Rels Valuation's offices, necessarily required those offices to communicate directly and frequently with brokers by the U.S. mails and by interstate wire facilities.

108.   Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  However, Plaintiffs can ascertain when and how their transaction involved the mail and wire facilities and can generally describe the occasions on which the RICO

010098-12 298699 V1

predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme.  Plaintiffs describe this below.

109.    Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved thousands of communications throughout the Class Period including telephone, email and U.S. Mail communications to borrowers and appraisers; the transmission by email and/or U.S. mail of appraisals prepared by appraisers and the transmission via mail and/or wire use of fraudulent HUD-1 forms and closing statements to complete transactions.  Rels Valuation correctly uses its website and the telephone to implement the Scheme and uses the wires to instruct appraisers as to appraisal outcomes and fees.  In addition to these RICO predicate acts, it was foreseeable to each Defendant that it would communicate with borrowers and appraisers by the U.S. mails and by interstate wire facilities.  In addition, wires and mails are used to transfer the proceeds of the Scheme to Rels Valuation's bank account.  Further, each Defendant has, in furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local offices or divisions.

110.    Specifically, Defendants perpetrated their Scheme against Plaintiffs through interstate mail and wire facilities by sending documents from California, Texas, and potentially other states, to Plaintiffs in Arizona.  Defendants utilized the U.S. Mail, Federal Express, and United Parcel Service, and email to send loan documents, appraisal reports, billing statements, and other related documents to Plaintiffs.  For example, on or about February 22, 2007, Wells Fargo sent a loan disclosure packet to the Gomezes via mail or email.  On or about February 22, 2007, Wells Fargo sent good faith estimates to the Gomezes.

**C.    Conduct of the RICO Enterprises' Affairs**

111.    During the Class Period, Defendants have exerted control over the Enterprises and, in violation of Section 1962(c) of RICO, Defendants have conducted or participated in the conduct of the affairs of those RICO Enterprises, directly or indirectly by controlling which appraisals it would accept to qualify a loan.  The brokers accepted

010098-12 298699 V1

Defendants' control over appraiser choice so that the brokers would get the loan approved and receive their commission on the origination of the loan. Rels Valuation followed Wells Fargo's directives, as to implementation.

112.    The Enterprises had a hierarchical decision-making structure headed by Wells Fargo.

**D.    The Defendants' Pattern of Racketeering Activity**

113.    Each of the Defendants conducted and participated in the affairs of the above-referenced Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. Defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Plaintiffs, the members of the Class and other intended victims.

114.    Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to exclude impartial and objective appraisers, that is, Plaintiffs and members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Each Defendant has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprises.

**E.    Damages Caused by the Defendants' Scheme**

115.    Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Class to be

1  injured in their business or property because Plaintiffs and members of the Class have

2  lost a substantial amount of money by virtue of the Scheme, including but not limited to,

3  overpayment on appraisal, the profits Rels Valuation skimmed through the Scheme, and

4  losses flowing from the corrupted appraisals made on Plaintiffs' and Class members'

5  properties.

6      116.   Under the provisions of Section 1964(c) of RICO, Defendants are jointly

7  and severally liable to Plaintiffs and members of the Class for three times the damages

8  that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit,

9  including reasonable attorneys' fees.

10                          **COUNT II**

11  **VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT**
    **AGAINST DEFENDANT RELS VALUATION**
12                   **12 U.S.C. § 2607(b)**

13      117.   Plaintiffs reallege and incorporate by reference the preceding allegations.

14      118.   For Plaintiffs and each Class member, Defendant Rels Valuation provided

15  appraisal services involving a federally-related mortgage loan.

16      119.   For Plaintiffs and each Class member, Defendant Rels Valuation did not

17  actually perform the appraisal, but instead contracted with a third-party appraiser to

18  perform the work of the appraisal for an agreed fee.

19      120.   Instead of charging Plaintiffs and each Class member the actual cost of the

20  appraisal, Defendant Rels Valuation marked up the third-party fee and charged Plaintiffs

21  and the Class an inflated fee for no additional appraisal services.

22      121.   In a document distributed to consumers by Wells Fargo called "Settlement

23  Costs and Helpful Information," under a section called "RESPA Protection Against

24  Illegal Referral Fees," Wells Fargo admits that the precise practice at issue violates

25  RESPA:

26          ▪   **Prohibited Fees.**  It is illegal under RESPA for anyone
              to pay or receive a fee, kickback or anything of value
27            because they agree to refer settlement service business
              to a particular person or organization.  For example,
28

010098-12 298699 V1

> your mortgage lender may not pay your real estate
> broker $250 for referring you to the lender.  It is also
> illegal for anyone to accept a fee or part of a fee for
> services if that person has not actually performed
> settlement services for the fee.  For example, a lender
> may not add to a third party's fee, *such as an appraisal*
> fee, and keep the difference.  (Emphasis added.)

122.    By charging appraisal fees in transactions in which they have not performed the appraisal which are far in excess of the actual cost of the appraisal charged by a third party, Defendant Rels Valuation has engaged and continues to engage in the practice of receiving a portion, split and percentage of a fee for the rendering of a real estate settlement service other than for services actually performed in violation of 12 U.S.C. § 2607 and Regulation X, 24 C.F.R. § 3500.14.

123.    Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Class are entitled to statutory damages for Defendant Rels Valuation's violations of 12 U.S.C. § 2607(b) in an amount equal to three times the amount of the appraisal fees charged and involved in Rels Valuation's violations.

124.    Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Class are entitled to the court costs of the action together with reasonable attorneys' fees.

## COUNT III

### VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
### 12 U.S.C. §§ 2607(a), (c)

125.    Plaintiffs reallege and incorporate by reference the preceding allegations.

126.    For Plaintiffs and each Class member, Defendants provided settlement services involving a federally-related mortgage loan.

127.    In connection with Plaintiffs' and each Class member's transaction, Defendant Wells Fargo accepted and Defendant Rels Valuation gave a thing of value – *i.e.*, control over the appraisal process and results – pursuant to an agreement that business incident to or part of a settlement service involving a federally related mortgage loan – *i.e.*, appraisal services – would be referred to Rels Valuation by Wells Fargo. Because Wells Fargo received a benefit from its referral to Rels Valuation beyond merely

010098-12 298699 V1

the return on its parent's common ownership, RESPA's safe-harbor provision for affiliated business arrangements is inapplicable to the Wells Fargo-Rels Valuation referral agreement.  As a result, Wells Fargo and Rels Valuation have referred real estate settlement services in violation of 12 U.S.C. § 2607(a) and Regulation X, 24 C.F.R. § 3500.14.

128.   Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Class are entitled to statutory damages for Defendants' violations of 12 U.S.C. § 2607(a) in an amount equal to three times the appraisal fees charged and involved in Defendants' violations.

129.   Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Class are entitled to the court costs of the action together with reasonable attorneys' fees.

## COUNT IV

**UNJUST ENRICHMENT
AGAINST DEFENDANT RELS VALUATION**

130.   Plaintiffs reallege and incorporate by reference the preceding allegations.

131.   As a result of Rels Valuation's practice of marking up third-party appraisers' fees and charging a fee when it performs no appraisal services, Defendant Rels Valuation has received a benefit from Plaintiffs and the Class in the form of the appraisal fees Plaintiffs and the Class paid to Rels Valuation, which fees were unearned and unreasonable and made for no additional or nominal settlement services and made in violation of federal and state law.  Rels Valuation has no contractual relationship with the Plaintiffs.

132.   Rels Valuation is aware of their receipt of the above-described benefits.

133.   Rels Valuation received the above-described benefits to the detriment of Plaintiffs and each of the other members of the Class.

134.   Rels Valuation continues to retain the above-described benefits to the detriment of Plaintiffs and the Class.

135.   As a result of Rels Valuation's unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek

010098-12 298699 V1

full disgorgement and restitution of Rels Valuation's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

136.   Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Rels Valuation as a result of their unfair, unlawful and/or deceptive practices.

### COUNT V

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION
LAW AGAINST WELLS FARGO
(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

137.   Plaintiffs reallege and incorporate by reference the preceding allegations.

138.   Through the Scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act toward a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading information.

139.   Defendant Wells Fargo is a resident of the State of California.  On information and belief, the actions and underlying decisions of Defendants alleged herein emanated from and occurred within the State of California.  California law applies to the claims of Plaintiffs and all Class members.  Wells Fargo planned and implemented its wrongful scheme in California and many of the wrongful acts emanated from Wells Fargo's California offices.  In addition, the largest concentration of Class members reside in California and the documents involving Plaintiffs were prepared in California and sent to Plaintiffs from California.  Therefore, it is reasonable and appropriate to apply California law to Defendant's acts throughout the United States.

140.   Wells Fargo has engaged and continues to engage in the Scheme.  Wells Fargo's acts and practices as described herein constitute unlawful, fraudulent and/or unfair business acts and practices.  As such, its conduct violates Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL").

010098-12 298699 V1

141.   Wells Fargo's conduct described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*, in that the conduct violates RESPA, RICO and the common law of unjust enrichment.  Specifically, as alleged herein, Wells Fargo has:

a.   Violated 18 U.S.C. § 1962(c) by conducting the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 18 U.S.C. § 1962(d).

b.   Violated 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by referring appraisal settlement services business to Rels Valuation (1) in exchange for control over the appraisal process and values assigned through Rels Valuation appraisals; and (2) without making accurate ABA disclosures required by RESPA;

c.   Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R. § 3500.14 by charging marked-up appraisal fees that vastly exceed the true costs of the appraisals actually charged to Rels Valuation by third-party appraisers, thus engaging and continuing to engage in the practice of receiving a portion, split and percentage of a fee for no services rendered; and

d.   Violated the common law governing unjust enrichment by receiving a benefit from Plaintiffs and the Class in the form of the marked-up appraisal fees, which fees were unearned and unreasonable, not for services actually performed and made in violation of federal and state law.

142.   Wells Fargo's conduct as described herein violates not only the unlawful prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong, independent of the other causes of action asserted herein.  Wells Fargo's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.  Any justification for Wells Fargo's practices is outweighed by the consequences and harm to Plaintiffs and the Class.

010098-12 298699 V1

143.    Wells Fargo's conduct as described herein also violates the "deceptive" prong of the UCL, independent of the other causes of action asserted herein.  Defendants acted deceptively in the following manner:

a.    Wells Fargo had a duty under RESPA to (1) disclose their affiliated relationship; and (2) provide a written estimate of the charge or range of charges generally made by Rels Valuation.  Defendants deceptively failed to make these required disclosures in that the RESPA disclosures made concealed the fact that precise fee for appraisal services was known and not disclosed.

b.    Wells Fargo participates in a scheme whereby Rels Valuation deceives consumers and members of the Class by falsely charging Plaintiffs and Class members appraisal fees far in excess of the actual fees charged by the third-party appraisers who performed the actual appraisals.

144.    Plaintiffs and the Class have suffered injury in fact and have lost money or property as a result of Wells Fargo's unlawful, unfair and/or deceptive business practices. Each of Wells Fargo's omissions was material to Plaintiffs and the Class in entering into the transaction with Wells Fargo and Plaintiffs and the Class relied on Wells Fargo's false and misleading misrepresentations in entering into the transactions at issue.

145.    The above-described unlawful, unfair and/or deceptive business practices present an ongoing threat of continuing injury to Plaintiffs, the Class and the general public.  Among other things, Plaintiffs, the Class and the general public continue to be financially disadvantaged by such conduct.  Such wrongful conduct is continuing and, unless Wells Fargo is restrained, it will continue to engage in such conduct.

146.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Class, individually and on behalf of the public, seek an order of this Court enjoining Wells Fargo from continuing its unfair, unlawful, and/or deceptive business acts or practices in the State of California and elsewhere.  The public, Plaintiffs and the Class will be irreparably harmed if such an order is not granted.

010098-12 298699 V1

147.   Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Wells Fargo as a result of their unfair, unlawful and/or deceptive practices.

## COUNT VI

### PATTERN OF UNLAWFUL ACTIVITY IN VIOLATION OF A.R.S. § 13-2314.04

148.   Plaintiffs reallege and incorporate by reference the preceding allegations.

149.   This Count is asserted on behalf of a subclass consisting of:

> All persons or entities involved in a real estate transaction in the State of Arizona who paid an appraisal fee for the appraisal of their property where Wells Fargo was the lender and Rels Valuation was the required appraiser and the appraisal was conducted by a third party.

150.   At all relevant times, in violation of A.R.S. § 13-2314.04, Defendants conducted a pattern of unlawful activity and illegally conducted an enterprise.

151.   At all relevant times, Wells Fargo and its partners and associates, and Rels Valuation, were associated with an enterprise that conducted affairs through a pattern of unlawful activity.

152.   The pattern of unlawful activity involved (1) Wells Fargo, its partners and associates, and Rels Valuation; (2) other mortgage brokers not named as defendants herein who have contracts with Wells Fargo pursuant to which they sell, arrange, promote, or otherwise assist Wells Fargo in directing borrowers into loans issued by Wells Fargo; and (3) appraisers who are hired by Rels Valuation to conduct appraisals.

153.   The pattern of unlawful activity is ongoing and involves both corporations and individuals that are and have been associated for the common or shared purposes of (1) committing fraud or theft with respect to the cost and quality of real estate appraisals; and (2) wrongfully manipulating the appraised values of real estate in transactions in which Wells Fargo is the mortgage lender.

154.   While all Defendants participate in and are part of the pattern of unlawful activity, they also have an existence separate and distinct from such activity.

010098-12 298699 V1

155.   In order to artificially inflate appraisal fees, Defendants needed a system that allowed them to do so.  The system established by the Defendants allows them to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities.  Rels Valuation's participation in the process allows the normal checks and balances within the mortgage process to be eliminated, permitting Defendants to advance their scheme and conceal its engagement in fraudulent activity.

156.   The Defendants conduct their pattern of unlawful activity as follows: (a) Wells Fargo tells a borrower through the Good Faith Estimate that Rels Valuation must perform the appraisal without disclosing the material fact that Wells Fargo owns Rels Valuation; (b) without telling the borrower, Rels Valuation then hires an independent appraiser to do the work instead; (c) Rels Valuation tells the appraiser that if he or she wishes to do business with Rels Valuation, they must perform the appraisal at a rate well below normal market rates for such services; (d) Rels Valuation then presents the home buyer with an appraisal fee well above the rate actually charged and secretly keeps the excess as its own profit; and (e) Wells Fargo receives a thing of value in exchange for referring its appraisal business to Rels because it is able to control the loan appraisal process, cost, and appraisal values through the scheme due to the common ownership of Wells Fargo and Rels Valuation by Wells Fargo & Co.

157.   The nature and pervasiveness of the scheme, which was orchestrated out of Wells Fargo's and Rels Valuation's offices, necessarily required those offices to communicate directly and frequently with one another, brokers, appraisers, and borrowers by the U.S. mails and by interstate wire facilities.

158.   Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities have been hidden and cannot be alleged without access to the Defendants' books and records.  However, Plaintiffs can ascertain when and how their transactions involved the mail and wire facilities, and can generally describe the

occasions on which the predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme Plaintiffs describe herein.

159.    Defendants' use of the U.S. mails and interstate wire facilities to perpetrate their scheme involved thousands of communications throughout the Class Period including telephone, email, fax, and U.S. Mail communications to borrowers and appraisers; the transmission by wire or mail of appraisals prepared by appraisers; and the transmission by wire or mail of fraudulent HUD-1 forms and closing statements to complete transactions.  In addition to these predicate acts, it was foreseeable to each Defendant that it would communicate with borrowers and appraisers via the U.S. mails and by interstate wire facilities.  In addition, wires and mails are used to transfer the proceeds of the scheme to Defendants' bank accounts.  Further, each Defendant has, in furtherance of the scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local offices or divisions.

160.    Specifically, Defendants perpetrated their scheme against Plaintiffs through interstate mail and wire facilities by sending documents from California, Texas, and potentially other states, to Plaintiffs in Arizona.  Defendants utilized the U.S. Mail, Federal Express, United Parcel Service, and email to send loan documents, appraisal reports, billing statements, and other related documents to Plaintiffs.  For example, on or about February 22, 2007, Wells Fargo sent a loan disclosure packet to the Gomezes via mail or email.  On or about February 22, 2007, Wells Fargo also sent good faith estimates to the Gomezes.

161.    Defendants' unlawful activities amounted to a common course of conduct, with similar pattern and purpose with the intent of both financial gain and depriving Plaintiffs and members of the Class from their money.  Defendants also intended to wrongfully exclude impartial and objective appraisers and to deprive Plaintiffs and members of the Class from such honest services.  Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same

010098-12 298699 V1

1  results affecting the same victims, including Plaintiffs and members of the Class.  Each

2  Defendant has engaged in the pattern of unlawful activity for the purpose of furthering its

3  scheme.

4  162.  Each of the Defendants conducted and participated in a pattern of unlawful

5  activity within a five-year period and for financial gain, which include acts that are

6  indictable under A.R.S. § 13-2310 for fraudulent schemes and artifices; A.R.S. § 13-2320

7  for residential mortgage fraud; 18 U.S.C. § 1341 for mail fraud; 18 U.S.C. § 1343 for

8  wire fraud; and A.R.S. § 13-1802(A)(3) for theft.  The violations of each of the statutes

9  are predicate acts under A.R.S. § 13-2301(D)(4)(b) and constitute a "pattern of unlawful

10  activity" under A.R.S. § 13-2314.04.  Defendants' pattern of unlawful activity likely

11  involved thousands of separate:  (1) misrepresentations regarding the true costs of

12  appraisals; (2) material omissions regarding the actual cost of the appraisal and who the

13  appraisal fee ultimately went to; and (3) instances of use of the U.S. mails or interstate

14  wire facilities in furtherance of their scheme.  The criminal deception, fraudulent

15  mailings, and interstate wire transmissions constitute a pattern of unlawful activity.

16  Collectively, these violations constitute the "pattern of unlawful activity" in which

17  Defendants intended to defraud Plaintiffs, the members of the Class and other intended

18  victims.

19  163.  Defendants' violations of state and federal law and their pattern of unlawful

20  activity, have directly and proximately caused Plaintiffs and members of the Class to be

21  injured in their business or property because Plaintiffs and members of the Class have

22  lost a substantial amount of money by virtue of the scheme, including but not limited to,

23  the profits Rels Valuation skimmed through the scheme, and losses flowing from the

24  corrupted appraisals made on Plaintiffs' and Class members' properties.

25  164.  Under A.R.S. § 13-2314.04, Plaintiffs and members of the Class are

26  entitled to three times the damages that Plaintiffs and the Class members have sustained,

27  plus the costs of bringing this suit, including reasonable attorneys' fees.

28

010098-12 298699 V1

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      For an order declaring that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, and for an order certifying this case as a class action and appointing Plaintiffs as representatives of the Class;

B.      For an order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

C.      For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair or deceptive practices; along with exemplary damages to each Class member for each violation;

D.      For judgment for Plaintiffs and the Class on their RICO and RESPA claims, in an amount to be proven at trial, for three times the amount of the appraisal fees paid to Defendants by Plaintiffs and the Class;

E.      For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and members of the Class;

F.      For an accounting of all credits, disbursements and charges and other benefits associated with Plaintiffs' and Class members' real estate transactions;

G.      For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

H.      For an order awarding Plaintiffs and the Class their attorneys' fees and costs; and

I.      Such other and further relief as may appear necessary and appropriate.

## IX.    JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of the claims alleged herein.

010098-12  298699 V1

1    RESPECTFULLY SUBMITTED this ____day of April, 2009.

2                                        HAGENS BERMAN SOBOL SHAPIRO LLP

3

4                                        By   s/Robert B. Carey
                                             Robert B. Carey
5                                            Donald Andrew St. John
                                         2425 East Camelback Road, Suite 650
6                                        Phoenix, Arizona 85016

7                                        By   s/Steve W. Berman
                                             Steve W. Berman
8                                            Thomas E. Loeser
                                             Genessa Stout
9                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1301 Fifth Avenue, Suite 2900
10                                       Seattle, Washington 98101

11                                       Attorneys for Plaintiffs and the Proposed Class

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

010098-12  298699 V1

1

**CERTIFICATE OF SERVICE**

2

3            I hereby certify that on April __, 2009, I electronically transmitted the foregoing

document to the Clerk's Office using the CM/ECF System for filing.  I also caused copies

4

to be served on the parties listed below in the manner indicated:

5

**VIA EMAIL AND OVERNIGHT MAIL**:

6

7    Barbara J. Dawson (AZ 012104)
Gregory J. Marshall (AZ 019886)

8    SNELL & WILMER L.L.P.
One Arizona Center

9    400 E. Van Buren
Phoenix, AZ 85004-2202

10   Telephone: (602) 382-6522
Facsimile: (602) 382-6070

11   bdawson@swlaw.com
gmarshall@swlaw.com

12

13   Thomas M. Hefferon (DC 461750)

14   Brooks R. Brown (CA 250724)
GOODWIN PROCTER LLP

15   10250 Constellation Boulevard
Los Angeles, CA 90067

16   Telephone: 310-788-5100
Facsimile: 310-286-0992

17   bbrown@goodwinprocter.com
thefferon@goodwinprocter.com

18

19   Attorneys for Defendants

20

21            DATED this _____ day of April, 2009.

22                                   By:   s/Dawn Van Diest
                                          Dawn Van Diest

23

24

25

26

27

28

- 42 -